IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:12-cv-00549-WYD-MEH
(associated with Case No. 2:11-cv-1202-TS, United States District Court, District of Utah)

VIA WEST, INC., a Colorado corporation,

      Petitioner,

v.

RICH MEDIA CLUB, LLC, a Delaware limited liability company; and
RICH MEDIA WORLDWIDE, LLC, a Delaware limited liability company,

      Respondents.

---

## OBJECTION TO PETITION TO QUASH NON-PARTY SUBPOENA

---

      Respondents Rich Media Club, LLC ("RMC") and Rich Media Worldwide, LLC

("RMW" and, collectively with RMC, "Rich Media"), by and through counsel, hereby submit

this Objection to Petition to Quash Non-Party Subpoena.

## __INTRODUCTION__

      In a lawsuit pending in the United States District Court for the District of Utah (the "Utah

Litigation"), Rich Media asserts claims against Nikolai Mentchoukov ("Mentchoukov"), James

W. Rowan ("Rowan"), and LeftsNRights, Inc. d/b/a LIQWID ("LIQWID" and, collectively with

Mentchoukov and Rowan, "Defendants") for, *inter alia*, breach of contracts designed to protect

proprietary aspects of Rich Media's product, conspiracy to breach such contracts, breaches of

fiduciary duty, and infringement upon elements of a Rich Media-owned patent.  In brief,

Mentchoukov accessed Rich Media's proprietary information through his role as an employee,

manager, and officer of the entities comprising Rich Media, and he formed LIQWID, with

Rowan, to use Rich Media's information, or modifications of it, to compete with Rich Media. In defense, Defendants assert that the LIQWID product is distinguishable from Rich Media's and that LIQWID has not used or improved the proprietary aspects of Rich Media's product. In conducting discovery and gathering information relevant to its claims and to Defendants' defenses, Rich Media has issued a subpoena (the "Subpoena") to Via West, Inc. ("Via West"), a third-party technology company that Defendants employ. Via West has petitioned to quash the Subpoena.

Defendants' petition should be denied because Rich Media is entitled to the information sought, and to inspect the full range of Defendants' source code, including back-end source code, in native format. This information, documentation, and tangible things are discoverable and necessary to Rich Media's claims. For these reasons, Rich Media requests that the Court deny the petition.

## RESPONSE TO VIA WEST'S STATEMENTS OF FACT

*9.      According to Defendants, all of Defendants' information and data that is stored on or located at Via West facilities is accessible remotely by a computer with the proper passwords. [Mentchoukov Decl.,¶ 11]*

Rich Media's Response to Via West's Statement of Fact No. 9: Rich Media disputes Via West's Statement of Fact No. 9 to the extent that it implies that the Subpoena is improper because the information sought therein is more readily accessible by Defendants than Via West. Rich Media has already requested the information from Defendants directly, and Defendants have failed to produce it. *See* Rich Media Statements of Fact Nos. 16, 22. If Defendants acknowledge their possession and control of the information sought in the Subpoena, they should

be required to either produce the information under Rich Media's Motion to Compel, Docket No.

53, or facilitate Via West's production.

     *10.     According to Defendants, the body of information stored, manipulated,
transmitted, integrated, and/or managed by means of the hardware and software at ViaWest is a
trade secret; Defendants' information includes source code; Defendants' information derives
economic value from being not generally known to, and not readily ascertainable by, other
persons who can obtain economic value from its use or disclosure; and Defendants' information
is subject to strict efforts to maintain its secrecy, including, but not limited to, be stored on a
secure system that only Nikolai Mentchoukov and Jim Rowan can access. [Mentchoukov Decl.,
¶ 12]*

     <u>Rich Media's Response to Via West's Statement of Fact No. 10</u>:  Rich Media objects to

Via West's Statement of Fact No. 8 in that it states a legal conclusion.  Further, Rich Media

disputes that the information sought in the Subpoena constitutes a trade secret.  The Subpoena

seeks only two, narrow categories of information: production and/or inspection of the electronic

devices belonging to Defendants, and production and/or inspection of the LIQWID source code.

*See* Rich Media Statement of Facts Nos. 17–18.  Defendants have already admitted that the open

source code is available publicly.  Mem. Supp. Mot. to Quash, at 12.  Further, Via West fails to

address the protective order already in place between the parties as of February 6, 2012 (the

"Protective Order").  Via West offers no explanation for why the Protective Order, which allows

a party to designate documents "Confidential Information/Attorneys Eyes Only" to prevent the

other parties from seeing them, does not adequately protect any potential trade secrets.  *See* Rich

Media Statement of Fact No. 15.

     *11.     According to Defendants, this subpoenaed information is at the heart of
LIQWID's business and is its most valuable asset. Virtually the entirety of the commercial value
of the LIQWID business is this information. [Mentchoukov Dec.l,¶ 14]*

     <u>Rich Media's Response to Via West's Statement of Fact No. 11</u>:  Disputed.  Via West's

unsupported assertions do not establish that the information sought in the Subpoena is a

protected trade secret.  Further, Via West fails to address the Protective Order, much less explain why the Protective Order is insufficient to protect any potentially valuable information.  *See* Rich Media's Response to Defs.' Statement of Fact No. 8, above.

*14.     According to Defendants, through the LIQWID web site one can access LIQWID open source code. The information publicly available would readily allow one skilled in the art to analyze the LIQWID product in terms of the claims of the patent and patent applications at issue in the lawsuit and determine whether or not LIQWID infringes the patent or includes the same technology as the patent applications. The open source code describes LIQWID inside the browser, and the RealVu technology operates exclusively inside and with the browser. [Mentchoukov Decl., ¶ 15]*

<u>Rich Media's Response to Via West's Statement of Fact No. 14</u>:  Disputed.  The publicly available open source code is incomplete.  While certain user interface files are located and accessible at www.liqwid.com, "the Back Office Files located in the file system for either www.liqwid.com or www.liqwid.net" are not.  *See* Dec. of Michael I. Shamos ("Shamos Dec") ¶ 31, filed concurrently herewith.

## FACTS AND PROCEDURAL HISTORY

1.     Between 2002 and December 2011, Mentchoukov was an employee, consultant, officer, and/or manager of Rich Media.  *See* Complaint, a true and correct copy of which is attached hereto as Exhibit A, ¶¶ 30–32.

2.     In or around April 2010, Mentchoukov began developing the LIQWID system without Rich Media's knowledge or consent.  *Id.* ¶ 32.

3.     Like Rich Media's product (the "RealVu Product,") the LIQWID system renders internet advertisements only when such advertisements are viewable in an internet browser.  Like the RealVu Product, the LIQWID system measures the actual view time of an advertisement.  Like the RealVu Product, the LIQWID system provides analytical data.  *Id.* ¶ 51.

4

4.     Rich Media contends that Mentchoukov developed the LIQWID system using Rich Media resources, work product, and contacts without Rich Media's knowledge or consent. *Id.* ¶¶ 73, 84.

5.     Rich Media discovered the LIQWID system and Mentchoukov's involvement with LIQWID after Mentchoukov sought to improperly solicit customers and potential customers of Rich Media. *Id.* ¶¶ 39–41.

6.     Thereafter, the Utah Lawsuit was filed on December 23, 2011.

7.     On January 3, 2012, Rich Media filed a Motion for Preliminary Injunction (the "PI Motion").

8.     Defendants and Rich Media (collectively, the "Parties") have agreed to a scheduling order expediting discovery (the "Scheduling Order"), which was entered by the Utah court on January 27, 2012.

9.     Rich Media's first claim is for patent infringement.  At issue is whether the LIQWID system infringes on Rich Media's FSDC Technology.  *Id.* ¶ 65.

10.     Rich Media's second claim is for breach of contract. *Id.* ¶¶ 69–75.  Rich Media's breach of contract claim and patent infringement claim are sometimes referred to collectively herein as the "Claims."  On October 23, 2010, Mentchoukov and Rich Media executed a document titled, "Summary of Terms and Conditions," referred to herein as the "October 2010 Contract."  A true and correct copy of the October 2010 Contract is attached hereto as Exhibit B.

11.     The October 2010 Contract states that when Mentchoukov is terminated from Rich Media, he must:

a.      Return to the Companies all materials in his possession that contain the RealVu Product and improvements to the RealVu Product, as well as all passwords to locked computer files, access codes to servers or co-location documentation and computer code written by Mentchoukov for the Companies during the consulting period or his employment with the Companies;

b.      Permanently destroy any data in whatsoever media, whether on his personal computer or otherwise in his possession, that contains improvements to the RealVu Product; and

c.      Assign to the Companies the intellectual property rights for such improvements to the RealVu Product developed by Mentchoukov during the course of his employment with the Companies, during the term of the Consulting Engagement and while he is a member of the Companies.

*Id.*

12.     Similarities between the LIQWID and RealVu Product give rise to Rich Media's claims that Mentchoukov breached the October 2010 agreement.  *See* Exhibit A, Compl. ¶¶ 51, 53–56, 73.  These similarities include, among others:

a.      Both LIQWID and RealVu (1) deliver a unique kind of internet ad; and (2) measure views of ads;

b.      Both market to the same audience—publishers, agencies, and advertisers;

c.      Both sell the ability to know when an ad is visible based on the viewable impression metric;

    d.  Both market the ability to analyze and report on the reach and frequency

of an ad; and

    e.  Both deliver and measure ads using the same process: (1) both systems

require a page administrator to complete a nearly identical registration process; (2) the

registration process for both systems requires the input of channel and demographic information

for web pages on which ads may be displayed; (3) the registration process for both systems

requires the page administrator to identify and specify an area on a webpage where ads are to be

displayed ("Content Rendering Area"); (4) based on inputs by the page administrator, both

systems generate a javascript tag (the "Tag") and identification code that determine where ads

are displayed; (5) both systems require a page administrator to insert the Tag on the webpage

where ads are to be displayed; (6) when a viewer requests a page containing a Tag, the Tag

causes the system to retrieve information about the viewer, webpage, and the location and size of

the Content Rendering Area(s); (7) the systems cause the viewer's web browser to create a

placeholder for ads that are to be displayed; (8) if the Content Rendering Area(s) (defined by the

page administrator) are within the viewable area of a viewer's browser, the designated ads are

displayed within the placeholder; (9) if less than a predesignated area of the Content Rendering

Area(s) is/are not within the viewable area of a viewer's browser, the designated ads do not

display; and (10) the system monitors the viewer's interaction with the webpage and ads in real

time, and gathers, stores, and reports on data that includes the following: number of time ads are

rendered, ad view time, clicks, number of unique viewers per ad, specific ads shown per number

of viewers, viewer's browser version, and viewer's display screen dimensions.

13.     On December 22, 2011, Mentchoukov, after learning that Rich Media had discovered his improper conduct and that his termination was imminent, gave notice that he was terminating his relationship with Rich Media.  Rich Media sent Mentchoukov a termination letter on December 23, 2011.

14.     Rich Media's second Claim is based on two contentions.  First, Rich Media contends that the LIQWID system uses the RealVu Product and is an improvement to the RealVu Product.  Second, Rich Media contends that Mentchoukov has breached the October 2010 Contract by failing to return all materials and information that uses the RealVu Product or is an improvement to the RealVu Product, to destroy data that contains improvements to the RealVu Product, and to assign Rich Media the intellectual property rights for improvements to the RealVu Product.  *Id.* ¶¶ 69–75.

15.     On or about February 6, 2012, the Parties entered into the Protective Order.  A true and correct copy of the Protective Order is attached hereto as Exhibit C.  The Protective Order provides, *inter alia*:

a.     Documents, electronic data, or discovery responses may be designated "Confidential Information," restricting access to it to specifically enumerated persons, including the court, litigation support personnel, the Parties' attorneys, experts, and the Parties.  *Id.* at ¶¶ 2–3.

b.     If a party has a reasonable, good faith basis to deny the other party access to information, the party may designate it "Confidential Information/Attorneys' Eyes Only."  Such a designation restricts access to the Court, litigation support personnel, the Parties'

8

attorneys, and retained experts. *Id.* at 4. The opposing party may not access information designated "Confidential Information/Attorneys' Eyes Only" without a court order. *Id.*

      c.    "Confidential Information shall not be used or disclosed by any party to this litigation, or by any person granted access thereto under this Order, for any business or competitive purpose or for any purpose other than the preparation and trial of this action. *Id.* at ¶ 6.

      d.    "Any third party upon whom the parties serve a subpoena requesting documents or other information in this action may avail itself of this Order and, by signing the Stipulation, shall become a party to this Stipulation and Order." *Id.* at ¶ 22.

    16.    To discover information relevant to the Claims, Rich Media has issued the following discovery requests:

      a.    Identify the physical location(s) of the LIQWID technology source code. (Hereinafter "Interrogatory No. 9").

      b.    Identify all electronic computing devices, including without limitation servers, personal computers, digital tablets (like iPad), personal digital assistants (like iPhone, Blackberry), and electronic data storage devices (portable hard drives, flash cards, memory sticks, etc.) in Mentchoukov's possession or control, or that Mentchoukov had possession or control of between August 2002 and the present. In so doing, identify the type of device and the device's location. If the device is no longer in Mentchoukov's control or possession, please explain why and where the device is now located. (Hereinafter "Interrogatory No. 20.")

      c.    Produce the LIQWID system source code, including without limitation, the LIQWID system source code that resides on LIQWID's system server(s), a publisher's content server that is enabled to deliver LIQWID enabled advertisements, and clients' computers interacting with a LIQWID ad. (Hereinafter "Request for Production No. 6.")

      d.    Produce for inspection all electronic computing devices, including without limitation servers, personal computers, digital tablets, personal digital

assistants, and electronic data storage devices in Mentchoukov's possession or control.  (Hereinafter "Request for Production No. 16.")

The foregoing discovery requests are hereinafter described collectively as the "Discovery Requests."  Copies of Rich Media's pertinent discovery requests are attached hereto as Exhibits D–E.

17.      In addition, Rich Media served the Subpoena on Via West (the "Via West Subpoena").  The Subpoena commands Via West to produce, or make available for inspection: "All electronic storage devices, including servers, that contain any electronically stored information owned, controlled and/or provided by Nikolai Mentchoukov, Leftsnrights, Inc., LIQWID, or James Rowan."  The information requested in the Subpoenas is referred to herein as the "Subpoenaed Information."  A true and correct copy of the Subpoena is attached hereto as Exhibit F.

18.      The Subpoenaed Information is critical to both of Rich Media's Claims.  *See* Shamos Dec. ¶¶ 16–17.

19.      LIQWID's complete source code itself is not limited to the open source code contained in LIQWID's front-end interface.  Rather, it also includes its back-end "Back Office Files," which Rich Media cannot access.  *See* Shamos Dec. ¶ 31.

20.      Production of LIQWID's complete source code, in its native format and configuration, is not burdensome, but would merely require Defendants to electronically copy required folders and to convey those files via FTP, hard drive, or any number of other methods. Initiating the copying and transmission process would take someone skilled in the art no more than a few minutes.  *See id.* ¶ 32.

21.    Although Defendants have partially responded to Rich Media's discovery requests, they have not produced the Subpoenaed Information.

22.    On February 15, 2012, Rich Media caused to be filed a motion to compel production of the information requested in the Discovery Requests and a supporting memorandum (the "Motion to Compel").  Oral argument on the Motion to Compel was held, in the Utah Lawsuit, on March 23, 2012.  The court in the Utah Lawsuit has not ruled on the Motion to Compel.

## ARGUMENT

A.    Via West Is Not Entitled to an Additional Protective Order Covering Defendants' Alleged Trade Secrets.

"There is no absolute privilege for trade secrets and similar confidential information." *Centurion Industries, Inc. v. Warren Steurer & Assocs.*, 665 F.2d 323, 325 (10th Cir. 1981). Where a subpoenaed party resists discovery of potentially confidential, proprietary information, courts in the Tenth Circuit apply the following framework:

> If the person or entity subject to the subpoena shows that the information sought is a trade secret or confidential research, development[,] or commercial information that might be harmful if disclosed, the burden shifts to the party seeking discovery to establish that disclosure is both relevant and necessary. Then the Court must balance the need for confidential information against the possible injury resulting from disclosure.[1]

*Int'l Coal Group, Inc. v. Tetra Fin. Group, LLC,* Case No., 2:09-cv-115-CW-PMW, 2010 U.S. Dist. LEXIS 51869, *3–4 (D. Utah May 24, 2010) (unpublished disposition) (alteration in original) (quotation marks omitted) (citing, among other authorities, *Centurion*, 665 F.2d at

---

[1] This framework applies regardless of whether the allegedly confidential information is sought from a third party under Rule 45, or by a party under other applicable discovery rules (e.g. Rule 33 or Rule 34).  *See* Adv. Comm. Notes to Fed. R. Civ. P. 45(c) (stating that Rule 45(c) corresponds to Rule 26(c)(7)).

325).[2] Accordingly, under the *Centurion* framework it is the resisting party that bears the initial burden to show the existence of a privilege. *See Broadcort Capital Corp. v. Flagler Sec.*, 149 F.R.D. 626, 628 (D. Colo. 1993) (noting that "the burden is on Record to show that he has a privacy interest or that some other privilege applies").

In this case, Via West cannot show good cause for another protective order because neither it nor Defendants can show that the Subpoenaed Information is a trade secret and that disclosure would cause specific, particularized harm. Via West contends that the Subpoenaed Information is "unquestionably a trade secret," and that the information "is at the heart of LIQWID's business and is its most valuable asset," but it provides no evidence of that. However, nowhere does Via West identify any specific prejudice or concrete harm that it or Defendants will incur if it discloses the Subpoenaed Information.

More to the point, Via West has not presented any argument that the Protective Order entered in this case is insufficient to address their fears, even if the Subpoenaed Information contains confidential information. The Protective Order provides that, if warranted, the disclosing party may designate information "Confidential Information/Attorneys' Eyes Only," a designation that prevents disclosure to the opposing parties themselves without a court order. Protective Order, Docket No. 42-1, ¶ 4. Further, the Protective Order prevents information from being "used or disclosed by any party . . . for any business or competitive purpose." *Id.* ¶ 6. The Protective Order assures that the Subpoenaed Information will not be used "for any purpose other than the preparation and trial of this action." *See id.* Because the Protective Order

---

[2] Where this framework is applied to a discovery request made through a third party subpoena, the person's third party status is but "one factor which the Court may weigh" in balancing the need for the information against the possible injury. *See Tetra*, 2010 U.S. Dist. LEXIS at 3; *Fanjoy v. Calico Brands, Inc.*, 2006 U.S. Dist. LEXIS 55158, *7 (D. Utah 2006) .

adequately protects Defendants, the Court should deny the petition.  *See, e.g., Phillip M. Adams & Assocs., L.L.C. v. Dell, Inc.*, Case No. 1:-5-cv-64-TS, 2008 U.S. Dist. LEXIS 96897 (D. Utah Nov., 19, 2008) (unpublished disposition) (finding that a party's source code was discoverable in part because the parties' protective order protected the source code from improper use); *see also Braddock Fin. Corp. v. Wash. Mut. Bank*, Case No. 08-cv-00265-WYD-MEH, 2008 U.S. Dist. LEXIS 55978, * 5 (D. Colo. May 30, 2008) (unpublished disposition) (noting, in a case involving disclosure of bank information, that "a protective order can preclude any burden caused by the disclosure of confidential information").[3]

However, even if Via West establishes good cause for additional protection despite the Protective Order, the Rule 26(c) analysis does not end.  *See Centurion*, 665 F.2d at 325.  Rather, the burden merely shifts to the requesting party to establish the relevancy and necessity of the information sought.  *See id.*  "The district court must then, within its discretion, balance the need for the trade secrets against the claims of injury resulting from disclosure." *Id.*  Because, as demonstrated below, the Subpoenaed Information is both relevant and necessary to Rich Media's claims, and any harm caused by disclosure will be outweighed by Rich Media's need for it, an additional protective order is unwarranted under Rule 26(c).  Thus, the Court should deny the petition.

B.    The Subpoenaed Information Is Relevant and the Subpoena Is Not Overbroad.

Via West incorrectly argues that the Subpoena seeks information that is not relevant to the above-captioned case and that the Subpoenas are overbroad on their face.  *See* Mem. Supp. Mot. to Quash, at 10–11.  However, courts have recognized that a party requesting discovery

---

[3] Contrary to Via West's argument, Rich Media does not aim to "circumvent" the Protective Order, which merely sets forth terms for designating information confidential.  The Protective Order does not say that trade secret information cannot be produced; indeed, its very existence demonstrates that such information may be produced.

under Rule 45 is entitled to the same breadth of materials available under Rules 26 and 34.  *See, e.g., Goodyear Tire & Rubber Co. v. Kirk's Tire and Auto Service Center of Haverstraw, Inc.*, 211 F.R.D. 658, 662 (D. Kan. 2003).  Federal Rule of Civil Procedure 34(a)(1)(A)–(B) gives a party the right to require production, inspection, or testing of electronically stored information and tangible things in the responding party's possession or control.  Further, under Rule 26(b)'s broad relevancy standard, information is discoverable so long as the request is "reasonably calculated to lead to the discovery of admissible evidence."  *In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1189 (10th Cir. 2009).

The Subpoena is reasonably calculated to lead to discovery of admissible evidence because the information stored on Via West's electronic storage devices, which includes the LIQWID source code, is crucial to both parties' claims and defenses.  For example, Rich Media's breach of contract claim puts the contents of Defendants' electronic storage devices directly at issue.  This information is essential to determine whether Mentchoukov complied with the October 2010 Contract, including but not limited to whether Mentchoukov has returned all of Rich Media's property.  Similarly, only the Subpoenaed Information, including the LIQWID source code, will reveal whether Defendants have infringed Rich Media's patents.

Via West attempts to paint the request for Defendants' electronically stored information as unreasonable and irrelevant by pointing out that it might lead to discovery of irrelevant information.  *See* Mem. Supp. Mot. to Quash, at 11.  This argument ignores the realities of the discovery process.  At present, Rich Media has no way of knowing what information is stored on the Via West servers.  Further, Defendants have refused to adequately answer Interrogatory No. 20, which asks Defendants to identify the Mentchoukov's electronic devices that might contain

relevant materials.  Consequently, Rich Media's ability to narrow the scope of the Via West Subpoena is hampered due, in large part, to Defendants' non-cooperation.  Thus, because the claims put the Subpoenaed Information directly at issue, the Subpoenaed Information is relevant and the Subpoenas are not overbroad on their face.

C.    The Subpoenaed Information Is Necessary to Allow Rich Media to Prove its Claims.

Via West makes much of the purported "heavy" burden that Rich Media must bear to show a "substantial need" for the Subpoenaed Information.  Mem. Supp. Mot. to Quash, at 11. But Via West overlooks that, under the *Centurion* framework discussed above, Rich Media has no obligation to show its need for the Subpoenaed Information unless Via West (or Defendants) identify specific and concrete harm that will result from disclosure.[4]  However, even if Via West or Defendants can show such harm, the Subpoenaed Information is necessary and should be disclosed.

Information has a direct bearing on the outcome of a case, and is therefore "necessary," where the requested information will allow the requesting party to evaluate its claims, or to prove or rebut the parties' claims or defenses.  *See, e.g., Centurion*, 665 F.2d at 325 (holding that a party's confidential technology was relevant and necessary to plaintiff's patent infringement claims where it was "needed to provide a basis for [plaintiff's] experts to adequately form an opinion of infringement and to rebut any assertions of noninfringement").

---

[4] Via West quotes Rule 45(c)(3)(C)(i) in an apparent attempt to argue that Rich Media bears the initial burden to demonstrate substantial need.  However, whether a party resists discovery of its trade secrets under a Rule 26(c) motion for a protective order or a Rule 45(c) motion to quash, the resisting party bears the initial burden to show that disclosure will cause that party specific harm.  *See, e.g., Fanjoy*, 2006 U.S. Dist. LEXIS at *6–12 (finding that the resisting party showed "substantial need" within the *Centurion* framework identified above); *see also* Adv. Comm. Notes to Fed. R. Civ. P. 45(c) (stating that Rule 45(c) corresponds to Rule 26(c)(7)).

In this case, the Subpoenaed Information is necessary to Rich Media's claims because it will bear directly on the outcome of the Claims.  For example, the October 2010 Contract requires Mentchoukov, among other things, to return all RealVu product and improvements to Rich Media, to destroy any data on media containing such improvements, and to assign Rich Media the property rights for any such improvements.   Like the information at issue in *Centurion*, Rich Media needs the Subpoenaed information to evaluate and prove their claims. *See also RGIS, LLC v. A.S.T., Inc.,* Case No. 2:07-cv-10975, 2008 U.S. Dist. LEXIS 4226, *6 (E.D. Mich. Jan. 22, 2008) (determining whether certain parts of the software are copied "requires analysis and comparison of complex computer software source codes").

Via West also argues that disclosure of the LIQWID source code is unnecessary because the LIQWID open source code is publicly available on-line.  Mem. Supp. Mot. to Quash, at 12. However, the open source code is incomplete in that it does not reveal the back-end, server-side source code.  Only the complete source code will allow Rich Media to adequately evaluate and prove its patent claims.  *See* Shamos Dec. ¶ 16.

D.     Disclosure of the Subpoenaed Information Is Justified.

Via West cites a number of cases to argue that Rich Media must show some heightened justification for disclosure of the Subpoenaed Information.  Mem. Supp. Mot. to Quash, at 12– 14.  However, as demonstrated above, this is error and, in making this argument, Via West ignores the controlling *Centurion* framework.  Further, even if Via West shows that disclosure of the Subpoenaed Information will cause specific harm or prejudice as *Centurion* requires, Rich Media has established that the Subpoenaed Information is relevant and necessary.  As such, assuming that Defendants show particularized harm, the Court must balance such harm claim

16

"against [Rich Media's] need for the information" sought.  *See Convey Oil Co. v. Continental Oil Co.*, 340 F.2d 993 (10th Cir. 1965).  Here, the balance of the harm that Defendants will allegedly suffer against Rich Media's demonstrated need weighs in favor of disclosure.  The cases cited by Via West to the contrary are neither controlling nor persuasive.

1.    **Numerous Factors Weigh in Favor of Disclosure of the Subpoenaed Information.**

Courts consider a number of factors to determine whether the parties' respective interests weigh in favor of disclosure of confidential, proprietary information.  *See, e.g., Phillip M. Adams & Assocs,* 2008 U.S. Dist. LEXIS 96897, **18–19 & n.34. These include: the dangers of abuse, the adequacy of protective measures, the parties' good faith, and the availability of other means of proof.  *Id.*  In *Phillip*, the court held that a party's source code was discoverable under the factors identified above.  The resisting party argued that "source code in the computer industry is rarely disclosed [and] that the source code is worth hundreds of millions of dollars."  *Id.* at *19–20.  The court found that the resisting party's source code could be disclosed to the opposing party's "independent expert" under the terms of the then-existing protective order, which adequately provided protection by allowing a party to designate certain materials attorneys' eyes only.  *Id.* at **16–17.  The court reasoned:

> The facts of a given case determine what protective measures will reasonably minimize the potential for harm to the party objecting to disclosure; however, the need for information is ordinarily held paramount.  In complex patent litigation, such as this case, parties are often dependent on their expert witnesses to fully understand the intricacies of the technology at issue.

*Id.* at *19.

The court also determined that the balance of harms favored disclosure.  First, while assuming that the source code was, in fact, a trade secret, the court noted that the resisting party

17

had previously represented "that a programmer of ordinary skill could reproduce source code that embodies the functions disclosed" in the patents at issue without undue experimentation. *Id.* at *20. The court reasoned that this representation was hard to reconcile with the resisting party's harm claim. *Id.* Balancing this alleged harm against the requesting party's need, the court held that disclosure was appropriate even though there could be other potential sources of evidence on the requesting party's claims. *Id.* at *25–26.

In this case, each factor in the balancing analysis weighs in favor of disclosure of the Subpoenaed Information. First, like the protective order at in *Phillip*, the Protective Order already adequately protects the Subpoenaed Information. Further, Via West claims, as did the resisting party in *Phillip*, in essence, that the source code is too valuable to produce. *See* Mem. Supp. Mot. to Quash, at 11 ("[The source code] is at the heart of LIQWID's business and is its most valuable asset."). Yet, here, as in *Phillip*, this argument is contradicted by their other claim that the LIQWID open source code is publicly available and that the website provides enough information to allow an expert to evaluate the parties' claims. *Id.* at 12.

Rich Media's need for the source code should be the court's "paramount" consideration. As demonstrated above, the source code is directly relevant to the claims, just as it was to the patent claims at issue in *Phillip*. Further, unlike the requesting party in *Phillip*, there is really no way for Rich Media to evaluate the parties' claims and defenses without the complete source code. Thus, this case presents even more compelling circumstances in favor of disclosure than *Phillip*. Accordingly, the balance of harms weighs decidedly in favor of disclosure.

**2.      The Case Law Cited by Defendants Does Not Affect the Subpoenas' Validity.**

Via West attempts to deny Rich Media its right to the Subpoenaed Information by

principally relying on two inapposite cases: *Viacom Int'l Inc. v. Youtube Inc.*, 253 F.R.D. 256, 259 (S.D.N.Y. 2008), and *Abarca Health, LLC v. Pharmpix Corp.*, Case No. 11-1218, 2011 U.S. Dist. LEXIS 95760 (D. Puerto Rico July 22, 2011). Both cases are readily distinguishable. First, Rich Media's claims more directly implicate the similarities between the Rich Media and LIQWID source code than the parties' claims in *Viacom* and *Abarca*. Both of those cases deal with copyright, or copyright-related, claims. By contrast, Rich Media's claims are for patent infringement and breach of contract, which contract prevented Mentchoukov from using or improving upon the Rich Media product for competitive purposes, and which required Mentchoukov to return all Rich Media property following the conclusion of his employment. The claims require a side-by-side comparison of the parties' source code to allow Rich Media and the Court to evaluate Defendants' claim that Rich Media's technology was not used. *See* Shamos Dec. ¶¶ 16–17.

Even more importantly, however, neither *Viacom* nor *Abarca* analyze disclosure of allegedly confidential material under the controlling *Centurion* framework. In light of the *Phillip* decision, and the *Centurion* decision, there is no need to go afield and rely on distantly analogous cases.[5] As discussed above, Rich Media has demonstrated that disclosure is appropriate under the applicable standard. Thus, neither *Viacom* nor *Abarca* should prevent disclosure. Instead, the Court should deny the petition under *Centurion* and *Phillip*.

---

[5] The District of Utah's decision in *Richards v. Convergys Corp.*, Case No. 2-05-cv-00790-DAK, 2007 U.S. Dist. LEXIS 9131 (D. Utah Feb. 6, 2007) (unpublished disposition), upon which Via West relies, is also distinguishable. There, the court quashed a subpoena requesting all employment-related documents simply because not all employment-related documents were relevant. Here, Via West has failed to point to any documents or information in its possession that are not relevant to Rich Media's claims.

E.      Alleged Logistical or Practical Barriers Do Not Bar Via West's Compliance with the
        Subpoena.

        Via West's remaining arguments are easily overcome.  It argues that disclosure of the

Subpoenaed Information is improper because the source code is not transmittable and does not

exist as a discrete code, but only various, interwoven system files.  But Shamos, Rich Media's

expert, testified that the source code most certainly is transmittable, and that it is easy to do.  *See*

Shamos Dec. ¶ 32.  However, even if production is impractical, Rich Media (or, more likely, its

expert) should still be entitled to enter the appropriate facilities so that Rich Media "may inspect,

measure, survey, photograph, test, or sample" the Subpoenaed Information.  Moreover, whether

or not the product is user-readable is not Via West's concern.  Because the Subpoenaed

Information is discoverable, and none of its other concerns bar production, Via West must

produce it.  Accordingly, the Court should not allow Via West to avoid disclosure of the

Subpoenaed Information upon the bald assertion that disclosure is practical.

F.      The Subpoena Is Not Cumulative or Duplicative.

        Via West argues that the Subpoena is cumulative or duplicative because Rich Media has

already requested the Subpoenaed Information from Defendants themselves.  But Rich Media

has not received the Subpoenaed Information and, in context of the imminent hearing on Rich

Media's motion for preliminary injunction, Rich Media can hardly be blamed for simultaneously

seeking discovery of the Subpoenaed Information, particularly the all-important LIQWID source

code, simultaneously from Defendants and Via West.  If Defendants had done as Via West

claims they can do—which is disclose the complete LIQWID source code in its native format—it

is true that there would be no need for the Subpoena.  But Defendants have not done so, even

though Rich Media is plainly entitled to the Subpoenaed Information.

## CONCLUSION

Via West should disclose the Subpoenaed Information.  It has not shown that Defendants will incur specific, concrete harm from such disclosure.  Further, Via West has failed to demonstrate why the Protective Order would inadequately protect any confidential information.  Conversely, Rich Media has amply demonstrated its need for the Subpoenaed Information and the relevance of the information to its claims.  Accordingly, Rich Media respectfully requests that the Court deny the petition.

Respectfully submitted,

Dated: March 27, 2012          By:     /s/ James K. Tracy
                                        James K. Tracy
                                        jtracy@btjd.com
                               BENNETT TUELLER JOHNSON & DEERE
                               3165 East Millrock Drive, Suite 500
                               Salt Lake City, UT 84121
                               Telephone:     801-438-2000
                               Facsimile:     801-438-2050

                               ATTORNEYS FOR RESPONDENTS

CERTIFICATE OF SREVICE

I certify that on this 27th day of March, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which gave electronic notice to the following.  I further certify that a true and correct copy of the foregoing was served via email and U.S. Mail, first class postage prepaid, upon the following:

Terry E. Welch
D. Craig Parry
Chad S. Pehrson
Parr Brown Gee & Loveless
185 South State Street, Suite 800
Salt Lake City, UT 84111
twelch@parrbrown.com
cparry@parrbrown.com
cpehrson@parrbrown.com

Todd P. Blakely
James M. Burke
Sheridan Ross P.C.
1560 Broadway, Suite 1200
Denver, CO 80202-5141
tblakeley@sheridanross.com
jburke@sheridanross.com

/s/ Lindsay Stott
Lindsay Stott
Assistant to James K. Tracy
BENNETT TUELLER JOHNSON & DEERE
3165 East Millrock Drive, Suite 500
Salt Lake City, UT 84121
Telephone:    801-438-2000
Facsimile:    801-438-2050
Email:        jtracy@btjd.com
              lstott@btjd.com